UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| JAMES AZIZ MAKOWSKI, | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | |
| | ) | No. 12 C 5265 |
| UNITED STATES OF AMERICA; | ) | |
| FEDERAL BUREAU OF | ) | Judge Joan B. Gottschall |
| INVESTIGATION (FBI); and | ) | |
| DEPARTMENT OF HOMELAND | ) | |
| SECURITY (DHS), | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION & ORDER

After Plaintiff James Aziz Makowski, a U.S. citizen, was arrested on July 7, 2010, an immigration detainer was issued against him. When Makowski pleaded guilty to a drug offense, the detainer caused him to be transferred to a maximum security prison rather than the boot camp for which he would otherwise have been eligible, and he spent approximately seventy days in custody before the detainer was canceled and he was allowed to complete the boot camp and secure his release. Makowski has sued the Federal Bureau of Investigation ("FBI") and the Department of Homeland Security ("DHS"), for violations of the Privacy Act, 5 U.S.C. §§ 552a(b), a(g)(1)(C), and (e)(5), and he has sued the United States for false imprisonment and negligence under the Federal Tort Claims Act ("FTCA"), 18 U.S.C. §§ 2671 *et seq*. He seeks monetary damages as well as declaratory and injunctive relief. The government moves to dismiss Makowski's First Amended Complaint in its entirety pursuant to Federal Rule of Civil Procedure 12(b)(6). For the reasons that follow, the motion is granted in part and denied in part.

## I. FACTS

Makowski was born in 1987 in India. He was adopted by U.S. citizens when he was one year old. He entered the United States on an IR4 visa, which is reserved for orphans adopted by U.S. citizens, and he became a U.S. citizen soon after his arrival. In 1989, the Immigration and Naturalization Service ("INS")—which is now DHS—issued Makowski a certificate of citizenship which included his alien registration number. Later that year, INS provided Makowski's parents with written verification of his U.S. citizenship status. Makowski has lived in the United States since arriving as an infant and has had a U.S. passport since an early age. He served in the U.S. Marines from 2004 to 2006. As part of the Marines' application process, he underwent an FBI background check.

In October 2009, Makowski was arrested in DuPage County, Illinois. When his father posted bond, Makowski was told that he could not be released because Immigration and Customs Enforcement ("ICE"), a component of DHS, had issued an immigration detainer against him. While in custody, Makowski explained to a person he believed to be an ICE officer that he was a U.S. citizen. The detainer was subsequently lifted, and he was released on bail.

Makowski was arrested again in DuPage County on July 7, 2010. The DuPage County Sheriff's office took his fingerprints and submitted them to the FBI for a background check. Pursuant to the FBI's participation in the immigration enforcement program "Secure Communities," also known as "Interoperability," the FBI transmitted Makowski's fingerprints to DHS's Automated Biometric Identification System ("IDENT") database for an immigration background check. In response, DHS indicated to the FBI that IDENT did not contain a "match" for Makowski's fingerprints, but it listed Makowski's place of birth as "India." Based on this

response, the FBI transmitted Makowski's fingerprints and criminal record to the ICE Law Enforcement Support Center (LESC) for follow-up immigration enforcement.

Makowski attached the ICE Secure Communities Standard Operating Procedures to his complaint as Exhibit A. As initially implemented, the FBI forwarded fingerprints and records to ICE's LESC only if the IDENT query returned a "match," indicating that the fingerprints belonged to an individual DHS had identified as a high priority subject. (First Am. Compl. ¶¶ 20, 25, ECF No. 45; Ex. A (Standard Operating Procedures) § 2.1, ECF No. 45-1.) But the FBI disclosed Makowski's fingerprints and records to LESC in spite of the "no match" response from DHS pursuant to a 2008 policy change whereby the FBI began to automatically forward to LESC fingerprints that generated a "no match" in the IDENT database if DHS's response also indicated that the individual was born outside of the United States. (*Id.* at ¶ 25.) Makowski attached meeting minutes detailing this policy change to his complaint. (First Am. Compl. Ex. H (Oct. 22, 2008 Staff Paper), ECF No. 45-8.)

On July 8, 2010, a day after Makowski was arrested in DuPage County for the second time, the ICE Chicago Field Office issued an I-247 immigration detainer against him. The detainer included his alien registration number and incorrectly listed his nationality as Indian, reflecting the fact that "INS and now DHS [had] not properly updated his records in over 20 years to accurately reflect that [he] is a citizen of the U.S." (First Am. Compl. ¶ 38.) On December 6, 2010, Makowski pleaded guilty to a drug offense and received a seven-year prison sentence. He did so under the impression that he would be allowed to participate in a 120-day boot camp in lieu of serving the seven-year sentence. (*Id.* at ¶ 43.) Makowski was transferred to the Stateville Correctional Center for processing into boot camp.

During processing, Makowski met with an ICE officer. He provided the ICE officer with copies of his U.S. passport and social security card. The ICE officer inspected and copied these materials. (*Id.* at ¶ 45.) Soon after processing, Makowski learned that he was ineligible for the boot camp because of the immigration detainer, and he was transferred to Pontiac Correctional Center to serve the seven-year prison sentence. (*Id.* at ¶ 46.)

With the assistance of an attorney, Makowski's father had the detainer canceled on January 25, 2011, and Makowski was transferred to be processed into the boot camp program on February 9, 2011. (*Id.* at ¶ 48.) He completed the boot camp program and was released on July 20, 2011. (*Id.* at ¶ 49.) In September 2011, Makowski began working as a network administrator. (*Id.*) He alleges that, were it not for the wrongful detainer issued on July 8, 2010, he would have completed boot camp by mid-May 2011 and would have sought employment and begun working prior to September 2011. (*Id.*)

Based on these allegations, Makowski brings claims against the FBI for improperly disclosing his fingerprints and records to DHS, in violation of the Privacy Act, 5 U.S.C. § 552a(b) (Count I). He seeks injunctive and declaratory relief based on this violation (Count V). He brings a claim against DHS for failing to properly maintain its records reflecting his citizenship, in violation of the Privacy Act, 5 U.S.C. §§ 552a(g)(1)(C) & (e)(5) (Count II), and seeks injunctive and declaratory relief based on this violation (Count VI). He brings separate claims against the United States under the FTCA for false imprisonment (Count III) and negligence (Count IV).

## II. LEGAL STANDARD

To survive a motion to dismiss pursuant to Rule 12(b)(6), a complaint must "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atl.*

*Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  A claim satisfies this pleading standard when its factual allegations "raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555-56; *see also Swanson v. Citibank, N.A.*, 614 F.3d 400, 404 (7th Cir. 2010) ("[P]laintiff must give enough details about the subject-matter of the case to present a story that holds together."). For purposes of the motion to dismiss, the court takes all facts alleged by the claimant as true and draws all reasonable inferences from those facts in the claimant's favor, although conclusory allegations that merely recite the elements of a claim are not entitled to this presumption of truth. *Virnich v. Vorwald*, 664 F.3d 206, 212 (7th Cir. 2011).  A plaintiff may plead himself "'out of court when it would be necessary to contradict the complaint in order to prevail on the merits.'" *Tamayo v. Blagojevich*, 526 F.3d 1074, 1086 (7th Cir. 2008) (quoting *Kolupa v. Roselle Park Dist.*, 438 F.3d 713, 715 (7th Cir. 2006)).

### III. ANALYSIS

**A.  Privacy Act Claims Against the FBI (Counts I and V)**

According to Makowski, the FBI's disclosure of his fingerprints to DHS's IDENT database and the subsequent transmission of his fingerprints and criminal record to ICE's LESC violated his rights under the Privacy Act.  The Privacy Act provides that "[n]o agency shall disclose any record which is contained in a system of records by any means of communication to any person, or to another agency, except pursuant to a written request by, or with the prior written consent of, the individual to whom the record pertains."  5 U.S.C. § 552a(b).

It is undisputed that Maskowski did not consent to the disclosure of his records.  The government contends, however, that the FBI's disclosures of Makowski's fingerprints and criminal record fall under the Privacy Act's "routine use" exception, § 552a(b)(3), and therefore were not barred by the Privacy Act.  Within the meaning of the Privacy Act, a "routine use" is

"the use of such record for a purpose which is compatible with the purpose for which it was collected." § 552a(a)(7). Agencies are required to publish in the Federal Register information about the systems of records they maintain, including "each routine use of the records contained in the system, including the categories of users and the purpose of such use." § 552a(e)(4)(D). Thus, the FBI's transmissions of Makowski's fingerprints and criminal record to IDENT and ICE's LESC are exempted from the Privacy Act's bar on disclosures only if (1) the disclosure was made pursuant to a published routine use and (2) the use of the records was compatible with the purpose for which they were collected.

      1. The Publication Requirement

      The Government argues that Blanket Routine Use 6 ("BRU 6"), which the FBI has published in the Federal Register, 66 Fed. Reg. 33,559 (June 22, 2001), justifies the FBI's disclosures. BRU 6, which applies to every FBI system of records, permits disclosure "[t]o such recipients and under such circumstances and procedures as are mandated by Federal statute or treaty." *Id.* The Government contends, and Makowski states in his complaint, that the FBI disclosed the fingerprints and criminal record pursuant to the Enhanced Border Security and Visa Entry Reform Act of 2002 (the "Enhanced Border Security Act"), 8 U.S.C. § 1722(a)(2). The relevant inquiry regarding the publication requirement of the "routine use" exception is therefore whether the Enhanced Border Security Act mandated the disclosures made by the FBI.

      Following the September 11, 2001 terrorist attacks in the United States, Congress enacted the Enhanced Border Security Act to "provide law enforcement more information about potentially dangerous foreign nationals" and "update technology to meet the demands of the modern war against terror." 147 Cong. Rec. S12247-05, 2001 WL 1521845 (Nov. 30, 2001) (statement of Sen. Feinstein). The pertinent portion of the statute requires the President to

"develop and implement an interoperable electronic data system to provide current and immediate access to information in databases of Federal law enforcement agencies and the intelligence community that is relevant to determine whether to issue a visa or to determine the admissibility or deportability of an alien." 8 U.S.C. § 1722(a)(2).

The government argues that "[t]o comply with section 1722's mandate, the FBI must forward to DHS *all* the fingerprint records it receives as a result of an arrest." (Defs.' Mot. to Dismiss 23, ECF No. 57-1.) In its view, the FBI has no way of knowing whether the fingerprints it receives from a local law enforcement agency belong to a citizen or alien until DHS runs a query in IDENT. Therefore, according to the government, "at the time of receipt following an arrest, all the fingerprints the FBI receives are potentially 'relevant' to an immigration decision and *all* must be forwarded to DHS." (*Id.* (emphasis in original).) The government further contends that even if § 1722(a)(2) is ambiguous, the FBI and DHS's interpretation of the provision is reasonable and entitled to deference. (*Id.*)

Makowski argues that § 1722(a)(2) is unambiguous and did not authorize—much less mandate—the FBI's disclosure of his fingerprints and criminal record to DHS. In his view, the statute "allows the FBI to transmit records to the DHS only when the FBI knows or believes someone to be 'an alien.'" (Pl.'s Resp. to Mot. to Dismiss 5, ECF No. 63.) Makowski contends that because the FBI's own records demonstrated that he was a United States citizen, his fingerprints could not have been "relevant" to an immigration decision, and § 1722(a)(2) did not require the disclosure. He further argues that the FBI and DHS's interpretation of § 1722(a)(2) is not entitled to deference because it is an unreasonable construction of an unambiguous statute.

In reviewing the FBI and DHS's interpretation of § 1722(a)(2), the court must resolve two issues. First, the court must determine "whether Congress has directly spoken to the precise

question at issue." *Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 842 (1984).[1] If the statute's text unambiguously speaks to the specific issue in question, then "the court, as well as the agency, must give effect to the . . . expressed intent of Congress." *Id.* at 842-43. But "if the statute is silent or ambiguous with respect to the specific issue, the [second] question for the court is whether the agency's answer is based on a permissible construction of the statute." *Id.* at 843. When Congress delegates to an agency the authority to formulate policy and rules for carrying out a statutory provision, even if the delegation is implicit, "a court may not substitute its own construction of a statutory provision for a reasonable interpretation made by the administrator of an agency." *Id.* at 843-44. This deferential approach respects an agency's superior ability—as compared to that of the court—to reconcile conflicting policies in determining the meaning and reach of a statute that the agency has been entrusted by Congress to administer. *Id.* at 844.

With respect to the first *Chevron* inquiry, § 1722(a)(2) does not directly speak to whether the FBI, upon receiving Makowski's fingerprints, was required to disclose them to DHS. The statute requires the President to "develop and implement an interoperable electronic data system to provide current and immediate access to information in [their] databases . . . that is relevant to determine whether to issue a visa or to determine the admissibility or deportability of an alien." 8 U.S.C. § 1722(a)(2). The President is instructed to do so "acting through the Assistant to the President for Homeland Security, in coordination with . . . the Attorney General, . . . [and] the Director of the Federal Bureau of Investigation." 8 U.S.C. § 1701(6). Congress provided no definition or clarification as to what information is "relevant" to immigration decisions,

_____

[1] The parties analyzed the issue of deference under *Chevron.* The court notes that it would reach the same conclusion, however, under *Skidmore v. Swift & Co.*, 323 U.S. 134 (1944), because the government's interpretation of the statute is both reasonable and persuasive.

implicitly delegating to the implementing agencies the authority to determine what is "relevant." While Makowski alleges that the FBI knew, based on information in its records, that Makowski was an American citizen and could not be subject to an immigration determination, § 1722(a)(2) requires the FBI to provide "immediate" access to its information. Because Congress did not specify what "immediate" means, the statute is ambiguous as to whether it required the FBI to disclose the information before it had an opportunity to verify Makowski's citizenship status from its own records. Because the statute's text does not "speak with the precision necessary to say definitively whether it" mandated the FBI's disclosure of Makowski's fingerprints and criminal record to DHS, the court must defer to the FBI and DHS's application of the statute if it was reasonable. *United States v. Eurodif S.A.*, 555 U.S. 305, 319 (2009).

Regarding the second prong of the *Chevron* inquiry, the court finds that the FBI and DHS's interpretation and application of § 1722(a)(2) with respect to the disclosure of Makowski's fingerprints and criminal record was reasonable. After receiving Makowski's fingerprints from the DuPage County Sheriff's office, the FBI forwarded the fingerprints to DHS for a query in the IDENT database before attempting to verify Makowski's citizenship status from its own records. The FBI did not know how long Makowski would be detained by the DuPage County Sheriff's office, and it was reasonable to believe that Congress intended in such circumstances for the FBI to forward the fingerprints and criminal record to DHS as soon as possible to determine whether the information would affect an immigration enforcement decision. Given that DHS's response indicated that Makowski was born in India, the FBI's disclosure of the fingerprints to ICE's LESC was also reasonable, as a foreign place of birth indicated that the FBI's information might be relevant to an immigration enforcement decision.

The fact that the FBI and DHS changed their policy in 2008 to forward to LESC the fingerprints and criminal record of an individual born in a foreign country even when IDENT generated a "no match" response, *see supra* at 3, does not undermine the reasonableness of the new policy. "Agency inconsistency is not a basis for declining to analyze the agency's interpretation under the *Chevron* framework." *Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 981 (2005). A change in policy will not undermine the agency's interpretation as long as "the agency adequately explains the reasons." *Id.* The Staff Paper attached to the complaint explained that the change reflected the fact that a "no match' response coupled with a foreign place of birth "may indicate a first encounter of a potential illegal alien." (Oct. 22, 2008 Staff Paper 3.) Better or swifter compliance with Congress's instruction "to improve and modernize efforts to identify aliens convicted of a crime, sentenced to imprisonment, and who may be deportable" (*id.*) is a reasonable and adequate explanation for the change in policy.

As § 1722(a)(2) is ambiguous as to what it required the FBI to do upon receiving Makowski's fingerprints, the court defers to the FBI and DHS's interpretation and application of the statute, which was reasonable. Thus, the FBI's transmissions of Makowski's fingerprints and criminal record to DHS's IDENT database and to ICE's LESC were mandated by Federal statute and covered by BRU 6. The disclosures meet the "routine use" publication requirement.

2. The Compatibility Requirement

The court next considers whether the purpose of the disclosures was compatible with the purpose for which the records were collected. The fingerprints submitted to the FBI by the DuPage County Sheriff's office and the FBI's criminal records on Makowski are part of the FBI's Fingerprint Identification Record System (FIRS). *See* 64 Fed. Reg. 52,347 (Sept. 28,

1999) (Categories of records in the FIRS include "[c]riminal fingerprints and/or related criminal justice information submitted by authorized agencies having criminal justice responsibilities" and "[i]dentification records sometimes referred to as 'rap sheets,' which are compilations of criminal history record information pertaining to individuals who have criminal fingerprints maintained in the system."). The purposes for collecting these records include performing "identification and criminal history record information functions" and maintaining "resultant records for local, state, tribal, federal, foreign, and international criminal justice agencies." *Id*. Makowski alleges that the FBI made the disclosures to determine whether he had been identified by DHS as a high priority target and to allow ICE to follow up with immigration enforcement. The disclosures were compatible with the published purposes for which the FBI collected them.

Because the FBI's disclosures have met both the publication and compatibility requirements of the Privacy Act's "routine use" exception, they were permissible under the Privacy Act. The FBI cannot be liable to Makowski under the Privacy Act without having violated the Act. *See* 5 U.S.C. § 552a(g)(1). Makowski's Privacy Act claims against the FBI are dismissed as he has pleaded facts that show he is not entitled to relief on these claims.

**B. Privacy Act Claim Against DHS for Actual Damages (Count II)**

In Count II, Makowski claims that DHS violated his rights under the Privacy Act, which, in addition to its restrictions regarding disclosures of records, requires an agency to "maintain all records which are used by the agency in making any determination about any individual with such accuracy, relevance, timeliness, and completeness as is reasonably necessary to assure fairness to the individual in the determination." 5 U.S.C. § 552a(e)(5). The Privacy Act permits an individual to bring a civil action against an agency that makes a determination adverse to the individual based on the agency's failure "to maintain any record concerning [that] individual

with such accuracy, relevance, timeliness, and completeness as is necessary to assure fairness in any determination relating to the . . . rights . . . [of] the individual that may be made on the basis of such record." 5 U.S.C. § 552a(g)(1)(C). If "the court determines that the agency acted in a manner which was intentional or willful," the plaintiff may recover "actual damages sustained by the individual as a result of the refusal or failure." § 552a(g)(4)(A). Makowski claims that the government is liable to him for "lost wages and other pecuniary and economic harm," caused by DHS's violations of his rights under the Privacy Act. (First Am. Compl. ¶ 85.)

The government does not challenge Makowski's allegation that DHS's records pertaining to him were inaccurate, but it argues that he has failed to state a claim for actual damages under the Privacy Act. It contends that his claim fails for three reasons: (1) he "has failed to allege facts showing that [DHS] 'intentionally or willfully' violated the Privacy Act"; (2) he "has not pleaded that he has suffered 'actual damages'"; and (3) he "has not alleged that [DHS's] alleged violations of the Privacy Act were the cause of his damages." (Defs.' Mot. to Dismiss 9, 15, 17.)

1. Intentional or Willful Violation

The government first argues that Makowski's claim for damages fails because he has pleaded no facts to support his allegation that DHS intentionally or willfully failed to update its records to reflect his citizenship status. As stated above, under § 552a(g)(4)(A) of the Privacy Act, a plaintiff is entitled to recover damages only if a "court determines that the agency acted in a manner which was *intentional* or *willful*." 5 U.S.C. § 552a(g)(4)(A) (emphasis added). According to the Seventh Circuit, the standard is "greater than gross negligence" and encompasses "reckless behavior and/or knowing violations of the Act on the part of the accused." *Moskiewicz v. U.S. Dept. of Agric.*, 791 F.2d 561, 564 (7th Cir. 1986). In determining

whether this standard is met, "a court may consider the entire course of conduct that resulted in the" Privacy Act violation. *Beaven v. U.S. Dep't of Justice*, 622 F.3d 540, 551 (6th Cir. 2010).

Drawing all reasonable inferences in Makowski's favor, the court finds that he has sufficiently pleaded facts to support his claim that DHS willfully violated its duty under the Privacy Act to maintain accurate records. Makowski has been a U.S. citizen since 1989. He alleges that after he spoke to a person he believed to be an ICE officer, ICE canceled the immigration detainer that had been issued against him in 2009. (First Am. Compl. ¶¶ 31, 33.) The court can reasonably infer from these allegations that ICE (a component of DHS) was put on notice not only that its record pertaining to Makowski's citizenship status was inaccurate, but also that this inaccuracy had the potential to contribute to an adverse immigration enforcement determination regarding Makowski—as it did with the issuance of the 2009 detainer. Makowski alleges that despite this notice, ICE did not update its records to reflect his citizenship status, as evidenced by the unlawful immigration detainer ICE issued against him in July 2010. (First Am. Compl. ¶ 38.) Accepting these allegations as true, it is plausible that DHS flagrantly disregarded Makowski's rights under the Privacy Act by failing to update its records after being put on notice of the inaccuracy and its potential to contribute to an unfair determination against him.

2. Actual Damages

The government next argues that Makowski has failed to plead that he suffered "actual damages," as required by § 552a(g)(4)(A). In an action in which an agency is found to have intentionally or willfully violated the Privacy Act, the United States is liable for "*actual damages* sustained by the individual as a result of the [violation], but in no case shall a person entitled to recovery receive less than the sum of $1,000." 5 U.S.C. § 552a(g)(4)(A) (emphasis added). The Supreme Court has held that "[t]he statute guarantees $1,000 only to plaintiffs who have suffered

some actual damages." *Doe v. Chao*, 540 U.S. 614, 627 (2004). In *F.A.A. v. Cooper*, the Supreme Court further explained that victims must demonstrate "pecuniary or material" harm. 132 S. Ct. 1441, 1451 (2012). Put simply, fear or emotional harm is insufficient.

In this case, Makowski has sufficiently pleaded that he suffered actual damages. He alleges that following his release from boot camp on July 20, 2011, he began working as a network administrator in September 2011. (First Am. Compl. ¶ 49.) He alleges that had the unlawful immigration detainer not been issued, he would have been released in mid-May, would have immediately sought gainful employment, and would have begun working earlier than September. (*Id.*) Makowski alleges that he therefore suffered lost wages and other pecuniary harm. (*Id.* at ¶¶ 78, 85.)

Although the government argues that these allegations are too speculative, the court must accept the allegations as true and draw all reasonable inferences in Makowski's favor. It is reasonable to infer that the seventy days of unnecessary incarceration cost Makowski prospective employment opportunities. Loss of economic opportunity is pecuniary harm. *See Speaker v. U.S. Dept. of Health and Human Servs. Ctrs. for Disease Control & Prevention*, 623 F.3d 1371, 1383 (11th Cir. 2010) (holding that an allegation of "loss of prospective clients as an attorney" satisfied the "actual damages" requirement); *Beaven*, 622 F.3d at 558 (remanding to the district court for factual findings because "[t]he additional 'lost time' damages sought by Plaintiffs may qualify as 'out-of-pocket losses'"). Taken as true, Makowski's allegations plausibly suggest that he suffered actual damages.

3. Causation

Finally, the government argues that the complaint fails to state a claim for damages against DHS because Makowski "has not alleged that the agenc[y]'s violation[] of the Privacy

Act [was] the cause of his damages." (Defs.' Mot. to Dismiss 17.) A plaintiff is entitled to monetary damages under the Privacy Act only if he proves that the Privacy Act violation was the proximate cause of the damages sustained. 5 U.S.C. § 552a(g)(4)(A); *see also Dickson v. Office of Pers. Mgmt.*, 828 F.2d 32, 37 (D.C. Cir. 1987). Because it was IDOC's decision to disqualify Makowski from boot camp because of the immigration detainer, the government argues that the causal chain between the alleged Privacy Act violation by DHS and Makowski's damages was broken. (Defs.' Mot. to Dismiss 18.)

Makowski has sufficiently alleged that DHS's violation of the Privacy Act proximately caused him to suffer actual damages. The complaint alleges an unbroken chain of events, beginning with DHS's failure to maintain accurate records regarding Makowski (First Am. Compl. ¶ 38), and ending with Makowski's lost wages (*id.* at ¶ 49.) Makowski has linked the alleged Privacy Act violation with his alleged damages by stating that ICE issued an unlawful detainer against him because of its reliance on DHS's inaccurate records (*id.* at ¶ 38), the detainer disqualified Makowski from boot camp (*id.* at ¶ 46), Makowski was not processed into boot camp until his father retained an attorney's assistance to prompt ICE to cancel the detainer (*id.* at ¶ 48), and the delay in processing into boot camp caused Makowski to remain incarcerated from May to July 2011, preventing him from seeking employment (*id.* at ¶ 49).

Although IDOC was responsible for disqualifying Makowski from boot camp, the independent action of a third party does not necessarily eviscerate proximate cause. *See Sullivan v. U.S. Postal Serv.*, 944 F. Supp. 191, 197 (W.D.N.Y. 1996) (where employer fired plaintiff after the Postal Service violated the Privacy Act in disclosing plaintiff's job application, summary judgment was inappropriate because "the question of proximate cause [wa]s a disputed question of material fact"). As the Seventh Circuit has explained, "reasonably foreseeable

intervening forces will not break the chain of proximate causation." *United States v. King-Vassel*, 728 F.3d 707, 714 (7th Cir. 2013).

Here, drawing all reasonable inferences in Makowski's favor, the impact of the immigration detainer on Makowski's incarceration was reasonably foreseeable. DHS was aware that local law enforcement entities would likely respond to the detainer by holding an inmate in custody, making prolonged detention a natural and normal result of the detainer. *See id. See also Carchman v. Nash*, 473 U.S. 716, 719 (1985) ("A detainer is a request filed . . . with the institution in which a prisoner is incarcerated, asking the institution either to hold the prisoner for the agency or to notify the agency when release of the prisoner is imminent."). When a detainer is issued, detention or a change in custody status is foreseeable even if detention based on an immigration detainer is not mandatory, as a split panel of the Third Circuit recently concluded. *See Galarza v. Szalczyk*, ___F.3d___, 2014 WL 815127, at *7 (3d Cir. Mar. 4, 2014) (holding in 2-1 decision that "detainers are not mandatory," but must be considered "requests"). Although the causal chain contains several links, Makowski has plausibly alleged that DHS's violation of the Privacy Act caused him actual damages.

## C.  Privacy Act Claim Against DHS for Equitable Relief (Count VI)

In addition to damages, Makowski seeks preliminary and permanent injunctive relief. He asks the court to order DHS to cease maintaining the fingerprints and records pertaining to him that were disclosed by the FBI to DHS. (First Am. Compl. ¶ 112.) He also asks the court to declare that DHS's maintenance of such data violates the Privacy Act. (*Id.* at ¶ 113.) The Government argues that Makowski lacks standing to pursue these claims for equitable relief. (Defs.' Mot. to Dismiss 18-19.)

To overcome a motion to dismiss for lack of standing, a plaintiff must plausibly allege that he has suffered a "concrete," "actual or imminent" injury that "is fairly traceable to the challenged action of the defendant" and is likely to be "redressed by a favorable decision." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 180-81 (2000). In other words, he must be "realistically threatened by a repetition of his experience." *City of Los Angeles v. Lyons*, 461 U.S. 95, 109 (1983). "[A] plaintiff must demonstrate standing separately for each form of relief sought." *Friends of the Earth*, 528 U.S. at 185.

Makowski argues that he has established a threat of imminent injury. For example, he alleges that when a potential employer attempted to verify his citizenship status using E-Verify, an electronic database managed by DHS and the Social Security Administration, E-Verify returned a response indicating that his status as a citizen could not be verified. (First Am. Compl. ¶ 69.) Makowski argues that equitable relief is necessary to remedy an ongoing violation of his rights under the Privacy Act.

Makowski might be able to establish standing to seek an injunction against future immigration detainers or to require DHS to correct his records. *See, e.g.*, *Morales v. Chadbourne*, C.A. No. 12-301-M, __F. Supp. 2d ___, 2014 WL 554478, at *15 (D.R.I. Feb. 12, 2014) (concluding that foreign-born American citizen had standing to seek injunctive relief because she was "twice inappropriately detained on a detainer alleging immigration violations," and "ICE officials told her that this could happen to her again"). The declaratory and injunctive relief he seeks in Count VI, however, is not related to the accuracy of DHS's recordkeeping, but to "DHS's maintenance of [his] fingerprint and other data in its IDENT database." (First Am. Compl. ¶ 108.) As the court held above, although Makowski may proceed on his claim in Count II that DHS failed to maintain his records accurately, his claim in Count I that the FBI violated

the Privacy Act by sharing his records has been dismissed. Furthermore, injunctive relief is not available for claims alleging inaccurate recordkeeping under § 552a(g)(1)(C) of the Privacy Act. It is available in suits seeking to amend a record under § 552a(g)(2) and suits for access to a record under § 552a(g)(3). *Chao*, 540 U.S. at 635 (Ginsburg, J., dissenting); *Clarkson v. IRS*, 678 F.2d 1368, 1375 n.11 (11th Cir. 1982) ("The Privacy Act expressly provides for injunctive relief for only two types of agency misconduct, that is, wrongful withholding of documents . . . and wrongful refusal to amend an individual's record . . . .").

In sum, Makowski has not alleged facts in support of his claim for equitable relief showing that his "injury is fairly traceable to the challenged action of the defendant" and "that the injury will be redressed by a favorable decision." *Friends of the Earth*, 528 U.S. at 180-81 (2000). Count VI is therefore dismissed. The dismissal is without prejudice, as Makowski may be able to allege facts stating a claim for equitable relief against DHS.

## D. FTCA False Imprisonment Claim against the United States (Count III)

### 1. False Imprisonment and Probable Cause

In Count III, Makowski alleges that the government's agents falsely imprisoned him, in violation of the FTCA. The FTCA "remove[s] the sovereign immunity of the United States from suits in tort." *Levin v. United States*, 133 S. Ct. 1224, 1228 (2013). Sovereign immunity is waived "under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred." 28 U.S.C. § 1346(b)(1). The FTCA requires courts to consult state law to determine whether the government is liable for its employees' torts. *FDIC v. Meyer*, 510 U.S. 471, 478 (1994) ("[The] law of the State [is] the source of substantive liability under the FTCA."). The FTCA does not waive sovereign immunity for claims based on alleged violations of federal law. *Id.* at 478.

The FTCA's waiver of sovereign immunity is subject to a number of exceptions set forth in 28 U.S.C. § 2680. The "intentional tort exception" preserves the government's immunity from suit for "[a]ny claim arising out of assault, battery, false imprisonment, false arrest, malicious prosecution, abuse of process, libel, slander, misrepresentation, deceit, or interference with contract rights," except for claims arising "out of assault, battery, false imprisonment, false arrest, abuse of process, or malicious prosecution" that are asserted against "investigative or law enforcement officers of the United States Government." 28 U.S.C. § 2680(h); *Millbrook v. United States*, 133 S. Ct. 1441, 1443 (2013). An "investigative or law enforcement officer" is "any officer of the United States who is empowered by law to execute searches, to seize evidence, or to make arrests for violations of Federal law." § 2680(h). Immigration officials have been held to fall within the law enforcement proviso. *See, e.g.*, *Medina v. United States*, 259 F.3d 220, 224 (4th Cir. 2001). Thus, sovereign immunity is waived with respect to a claim alleging false imprisonment by immigration officials. *See, e.g.*, *Liranzo v. United States*, 690 F.3d 78, 94-95 (2d Cir. 2012) ("[T]he United States has indeed waived its sovereign immunity from suit as to Liranzo's 'claim,' which 'aris[es] . . . out of . . . false imprisonment [and] false arrest.'" (quoting § 2680(h))).

As stated above, state law provides the substantive law governing an FTCA claim. Under Illinois law, to state a claim for false imprisonment, "the plaintiff must allege that his personal liberty was unreasonably or unlawfully restrained against his will and that defendant(s) caused or procured the restraint." *Arthur v. Lutheran Gen. Hosp.*, 692 N.E.2d 1238, 1243 (Ill. App. Ct. 1998). A claim for false imprisonment requires a showing that "the plaintiff was restrained or arrested by the defendant, and that the defendant acted without having reasonable grounds to believe that an offense was committed by the plaintiff." *Meerbrey v. Marshall Field & Co.*, 564

N.E.2d 1222, 1231 (Ill. 1990). Put another way, to succeed on a claim for false imprisonment, a plaintiff must show that he was restrained unreasonably or without probable cause. *Martel Enters. v. City of Chi.*, 584 N.E.2d 157, 161 (Ill. App. Ct. 1991). "Probable cause is an absolute bar to a claim for false imprisonment." *Poris v. Lake Holiday Prop. Owners Ass'n*, 983 N.E.2d 993, 1007 (Ill. 2013).

According to Makowski's complaint, "DHS's and ICE's agents, officers, servants, and employees willfully and unlawfully restrained [him] and deprived him of his liberty to move more freely." (First Am. Compl. ¶ 89.) Makowski claims that the issuance of the detainer resulting in his detention in prison was unreasonable because no probable cause existed to believe that he had committed an immigration violation, particularly after he met with an ICE officer and provided copies of his passport and Social Security card. (*Id.* at ¶¶ 90-91.)

The government first argues that the false imprisonment claim fails because Makowski was held pursuant to legal process: he pleaded guilty to a drug offense and was sentenced to seven years' imprisonment. Makowski, however, argues that his claim is based on the fact that he was detained pursuant to the immigration detainer, not the state criminal charges. Makowski alleges that he spent seventy days in custody as a result of the detainer. The court concludes that he has sufficiently alleged that he was unlawfully restrained as a result of the detainer.

More problematic is the question of whether probable cause existed to issue the detainer. The detainer was issued in accordance with the Secure Communities Standard Operating Procedures attached to the complaint as Exhibit A. That document states, "When ICE determines an alien has been charged or convicted of a Level 1 offense that could result in removal . . . ICE will file an Immigration Detainer (Form I-247) at the time of booking with the local [Law Enforcement Agency] that has custody of the alien." (Standard Operating Procedures

§ 2.1.5.) Level 1 offenses include "drug offenses involving a sentencing to a term of imprisonment greater than one year." (*Id.*)

Makowski, who received a seven-year sentence for a drug offense, committed a Level 1 offense, and DHS records indicated that he was an alien. Thus, the issuance of the detainer in July 2010 was supported by probable cause. ICE officers relied on incorrect DHS records when they issued the detainer. But Seventh Circuit precedent indicates that an incorrect assumption about the facts does not destroy probable cause. *See Payne v. Pauley*, 337 F.3d 767, 775 (7th Cir. 2003) ("The test is an objective one and evaluates whether probable cause existed on the facts as they appeared to a reasonable police officer, even if the reasonable belief of that officer is ultimately found to be incorrect.").

Makowski, however, met with an ICE officer in December 2010, and he provided the officer with his passport and other information indicating his U.S. citizenship. The government points out that this was five months after the detainer was issued. But Makowski has submitted as an exhibit an ICE memorandum dated November 19, 2009, directing officers and agents to "immediately examine the merits of [a] claim" of U.S. citizenship by a detained individual, and indicating that "[a]bsent extraordinary circumstances," a recommendation on the claim should be prepared within 24 hours and that a decision should be issued within 24 hours thereafter. (First Am. Compl. Ex. D (Nov. 19, 2009 Mem.), ECF No. 45-4.) In Makowski's case, no prompt recommendation and decision resulted from his citizenship claim, and the detainer was not canceled until his father sought legal assistance. To analogize to the criminal context, "[t]he continuation of even a lawful arrest violates the Fourth Amendment when the police discover additional facts dissipating their earlier probable cause." *BeVier v. Hucal*, 806 F.2d 123, 128 (7th Cir. 1986) (citing *People v. Quarles*, 410 N.E.2d 497 (Ill. 1980)); *see also Brooks v. City of*

*Aurora, Ill.*, 653 F.3d 478, 486 (7th Cir. 2011) (finding that the probable cause inquiry is the same for § 1983 false arrest and false imprisonment claims).  The court concludes that Makowski has alleged a plausible claim for false imprisonment against the United States.

        2.  The Discretionary Function Exception to the FTCA

        The government argues that, even if Makowski has pleaded an FTCA claim, the challenged conduct falls within the "discretionary-function" exception to the FTCA, which states that the United States shall not be liable for any claim based on "the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or employee of the Government, whether or not the discretion involved be abused."  28 U.S.C. § 2680(a).  As the Supreme Court has explained, "[t]he exception covers only acts that are discretionary in nature, acts that involve an element of judgment or choice, and it is the nature of the conduct, rather than the status of the actor that governs whether the exception applies." *United States v. Gaubert*, 499 U.S. 315, 322 (1991) (internal citations and quotation marks omitted).  "The purpose of this discretionary-function exception is to 'prevent judicial "second-guessing" of legislative and administrative decisions grounded in social, economic, and political policy through the medium of an action in tort.'"  *Reynolds v. United States*, 549 F.3d 1108, 1112 (7th Cir. 2008) (quoting *Berkovitz v. United States*, 486 U.S. 531, 535 (1988)).

        The Supreme Court has stated that a court should first inquire "whether the challenged actions were discretionary, or whether they were instead controlled by mandatory statutes or regulations." *Gaubert*, 499 U.S. at 328.  Where a course of action is specifically prescribed by a regulation or policy, an employee's conduct cannot be discretionary.  Likewise, "[w]hen a suit charges an agency with failing to act in accord with a specific mandatory directive, the discretionary function exception does not apply."  *Berkovitz*, 486 U.S. at 544.

Here, the government argues that DHS and ICE exercise discretion in conducting investigations and determining whether to issue an immigration detainer. The government is correct that "challenges to the quality of an investigation or prosecution are generally barred by the discretionary-function exception." *Reynolds*, 549 F.3d at 1113. On the other hand, when government employees engage in conduct proscribed by law or policy, that conduct is "separable from the discretionary decision to prosecute." *Id.* (exception did not apply when government investigators were alleged to have knowingly provided false information to prosecutors).

In this case, Makowski has plausibly alleged that, in issuing and failing to cancel the immigration detainer, employees of DHS and ICE acted in a manner contrary to federal policies, which required ICE to promptly investigate any claims of citizenship. (*See* Nov. 19, 2009 Mem.) In failing to investigate Makowski's claim to be a citizen and to cancel the detainer, the federal agents therefore failed "to act in accord with a specific mandatory directive, [and] the discretionary function exception does not apply." *Berkovitz*, 486 U.S. at 544.[2]

**E. FTCA Negligence Claim against the United States (Count IV)**

Turning to Count IV, the government argues that Makowski's negligence claim under the FTCA is barred by sovereign immunity. As discussed above, the FTCA's waiver of sovereign immunity is subject to a number of exceptions set forth in 28 U.S.C. § 2680. The "intentional tort exception" preserves sovereign immunity from suit for "[a]ny claim arising out of . . .

_____

[2]     The court need not decide whether the government can satisfy the second part of the discretionary-function test: whether the challenged conduct is a permissible exercise of policy judgment. *See Berkovitz*, 486 U.S. at 537. The Second Circuit has held that the exception did not cover INS agents' actions in detaining a U.S. citizen because these actions "are not the kind that involve weighing important policy choices." *Caban v. United States*, 671 F.2d 1230, 1233 (2d Cir. 1982); *see also Uroza v. Salt Lake Cnty.*, No. 1:11CV713DAK, 2013 WL 653968, at *9 (D. Utah Feb. 21, 2013) (relying on *Caban* in holding that the discretionary-function exception did not bar an FTCA claim based on ICE agents' issuance of a detainer).

misrepresentation." 28 U.S.C. § 2680(h). The government argues that Makowski's negligence claim falls within this category of claims, for which sovereign immunity has not been waived.

In *Deloria v. Veterans Administration*, the Seventh Circuit held that the FTCA's exceptions for "misrepresentation and deceit" encompassed a claim that VA officials had conspired to distort the plaintiff's medical records, resulting in the denial of his disability benefits. 927 F.2d 1009, 1012 (7th Cir. 1991). The court emphasized that "the United States retains its sovereign immunity with respect to charges of deceit and misrepresentation—regardless of the technical terms in which they are framed." *Id.* at 1013. In reaching this conclusion, the Seventh Circuit cited two out-of-circuit cases holding that negligent recordkeeping claims against federal agencies were barred under the exception for "misrepresentation." *See Alexander v. United States*, 787 F.2d 1349 (9th Cir. 1986) (claim that government negligently failed to remove information from plaintiff's record that a state court had ordered to be expunged was a misrepresentation claim barred by § 2680(h)); *Bergman v. United States*, 751 F.2d 314 (10th Cir. 1984) (claim that government negligently failed to correct classification records was barred by § 2680(h)), *cert. denied*, 474 U.S. 945 (1985).

Similarly, in *Omegbu v. United States*, a Wisconsin district court concluded that "[t]he plaintiff's allegation that the FBI or USCIS misrepresented information—whether intentionally or negligently—falls under the intentional tort exception of § 2680(h)." No. 10-C-765, 2011 WL 2912703, at *4 (E.D. Wis. July 18, 2011). The court reasoned that the negligent mishandling of records amounts to misrepresentation, a claim barred by sovereign immunity. The court of appeals affirmed, stating that the FTCA's exception for misrepresentation "bars claims against the United States for the willful mishandling of records." *Omegbu v. United States*, 475 F. App'x 628, 629 (7th Cir. 2012).

This court agrees with the government that under *Deloria* and *Omegbu*, Makowski's negligence claim falls within the intentional tort exception to § 2680(h) for misrepresentation and is therefore barred by sovereign immunity.  Count IV is dismissed.

## IV. CONCLUSION

For the reasons explained above, the government's motion to dismiss is granted in part and denied in part.  Counts I, IV, and V are dismissed.  Count VI is dismissed without prejudice. The motion is denied as to Counts II and III.


ENTER:


_____/s/_____
JOAN B. GOTTSCHALL
United States District Judge

DATED:  March 18, 2014